THE UNITED STATES DISTRICT COURT
FOR DISTRICT OF CONNECTICUT

FILED

2018 APR 26 P 12: 24

U.S. DISTRICT COURT
NEW HAVEN, CT.

STATE OF CONNECTICUT          :      3:18mj680(JCH)

                                     :      ss: New Haven, Connecticut

COUNTY OF NEW HAVEN         :      April 9, 2018


## AFFIDAVIT IN SUPPORT OF APPLICATION FOR WARRANT TO SEARCH AND SEIZE

I, Keith M. Hall, being first duly sworn, hereby depose and state as follows:

1.      I am a Special Agent employed by the Federal Bureau of Investigation ("the FBI")

and have been so employed since March 2005.  I am currently assigned to the FBI, New Haven

Office, Joint Terrorism Task Force (JTTF), which is a unit comprised of federal agents and police

officers, and is charged with conducting terrorism related investigations.  I have worked in this

capacity since July 2005.  Prior to working for the FBI, I was employed by the United States Drug

Enforcement Administration ("DEA") as a Special Agent for approximately four and a half years.

I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure

41(a)(2)(C), that is, a government agent authorized to enforce criminal laws and duly authorized

by the Attorney General to request a search warrant.

2.      I am an FBI Special Agent Bomb Technician (SABT).  I am currently certified to

conduct Render Safe Procedures on Improvised Explosive Devices (IEDs) and perform bomb

technician operations.  My training includes completion of the Basic Course at the FBI

Hazardous Devices School, and several advanced courses including IED electronics, post-blast investigation, stabilization of radiological dispersion devices/improvised nuclear devices, manual techniques and the deployment of electronic countermeasures.

3.      During the course of my career, I have participated in numerous criminal investigations, including investigations into suspected bomb makers, bombing incidents, unlawful possession of explosives/destructive devices, firearms violators, violent criminals, and international/domestic terrorists.  My participation in these investigations has included conducting assessments as a SABT, which require me to specifically evaluate potential threats individuals may pose with respect to the manufacturing of IEDs and the manufacturing of homemade explosives utilizing explosive precursor chemicals and components.  Additionally, I have also had experience with obtaining information and intelligence utilizing technical sources, confidential informants, cooperating witnesses, and undercover law enforcement officers; coordinating the execution of search and arrest warrants; conducting electronic and physical surveillance; analyzing records related to a variety of criminal activities; and testifying before Grand Jury and District Court proceedings. Finally, I have participated in several investigations involving the use of court-authorized interception of wire and electronic communications and have become familiar with the manner in which individuals utilize electronic devices to facilitate a variety of criminal activity.

4.      I am currently investigating Alan Zaleski (ZALESKI) and others in connection with attempts to acquire IEDs, diverted military explosives, ammunition and firearms in the New Britain, Connecticut area.  I am also investigating ZALESKI in connection with potential false

statements made to the United States Probation Office and United States District Court in Connecticut. Your affiant is investigating potential violations of 18 U.S.C. § 922(g)(1) (felon in possession of ammunition), 18 U.S.C. § 842(i)(1) (felon in possession of explosives), 18 U.S.C. § 842(h) (receipt, possession and transportation of a stolen explosive material knowing or having reasonable cause to believe the explosive materials were stolen), 26 U.S.C. § 5861(f) (make a firearm, specifically a "destructive device") (collectively, the "TARGET OFFENSES") and 18 U.S.C. § 1001 (false statements), (collectively, the "FALSE STATEMENT OFFENSES").

5.       I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for (1) a warrant to seize and search a cellular telephone with the number (860) 797-4848 and Electronic Serial Number 089568154302726224, the "TARGET DEVICE" , currently in the possession of and subscribed by ZALESKI, and to seize evidence, fruits, and instrumentalities as more fully described in Attachment A, which is incorporated into this affidavit as if fully set forth herein; (2) a warrant to search 863 Shuttle Meadow Avenue, Berlin, Connecticut and the surrounding property (the "TARGET PREMISES"), currently rented by ZALESKI and to seize evidence, fruits, instrumentalities as more fully described in Attachment B, which is incorporated into this affidavit as if fully set forth herein; and (3) a warrant authorizing members of the Federal Bureau of Investigation, the United States Marshals Service and other law enforcement officers to ascertain the physical location of the TARGET DEVICE including but not limited to call detail records for a period of 90 days prior to the date of this warrant, cell site activations, as well as cell site E-911 Phase II data or other GPS or precise location information

including the use of a cell site simulator concerning the TARGET DEVICE (the "Requested Information"), for a period of 30 days as described in Attachment C.

6.      Based on the facts set forth below, there is probable cause to believe the TARGET DEVICE has stored information about individuals involved in the TARGET OFFENSES, and the stored information for the TARGET DEVICE is evidence of participation in these offenses.  In addition, based on the facts set forth below, there is probable cause to believe that, as more fully described in Attachment B, there is evidence located at the TARGET PREMISES in the C relative to the FALSE STATEMENT offenses.

7.      The facts contained in this affidavit are based on my personal participation in the investigation, information provided to me by U.S. Probation Office, and other members of law enforcement, phone records, information obtained from witnesses and other sources of information, as well as my experience and training.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge and information about this matter.  For the reasons set forth herein, I have probable cause to believe, and I do believe, that the information sought from the requested search warrant will constitute evidence, contraband, fruits, or instrumentalities of violations of the TARGET OFFENSES and the FALSE STATEMENT OFFENSES.

## **BACKGROUND**

8.      ALAN D. ZALESKI came to the attention of the FBI Joint Terrorism Task Force in approximately March 2006 for illegally possessing machine guns and numerous unregistered

weapons, including a sawed-off shotgun, silencers, grenades and improvised explosives devices (IEDs).

9.      ZALESKI was prosecuted in the District of Connecticut and was ultimately sentenced to 101 months imprisonment, followed by three years of supervised release on February 3, 2011 by the Honorable District Judge Ellen Bree Burns.

10.     ZALESKI completed his imprisonment in December 2015 and is currently on supervised released until December 2, 2018. In addition to standard conditions of release, a special condition was imposed instructing ZALESKI to not possess a firearm or dangerous weapon of any kind.

11.     On May 15, 2016, the FBI and Connecticut State Police (CSP) Emergency Services Unit Bomb Squad assisted the Wallingford Police Department with a search of a storage unit located at 89 N. Plains Industrial Road. Wallingford Police was called by Cynthia Zaleski, who advised she located what she believed to be explosives within her father's storage unit. Her father, Steven Zaleski, recently passed away and Cynthia was cleaning out her father's belongings from the unit. A subsequent search of the unit resulted in the recovery of three (3) blocks of military C-4 (M112 charge demolition), two (2) three (3) foot lengths of military detonation cord, two (2) military electric blasting caps, unassembled grenade housings and strikers, hobby fuse, four (4) bottles of black powder and numerous rounds of ammunition. Additionally, three (3) STEN MK unassembled machine-guns were located near the aforementioned military explosives along with

a cardboard box with a shipping label addressed to "Al Zaleski" (ZALESKI), who Cynthia identified as her uncle and father's brother.

12.     In August, 2016, the FBI had the recovered military explosives forensically tested for the presence of DNA and learned DNA swabs on two (2) of the C-4 blocks and one (1) of the detonation cords contained a mixture of DNA which was sufficient for comparison with a known sample from any suspect.

13.     The FBI investigation into the recovered military explosives identified ZALESKI as a potential suspect. As a result, the FBI contacted ZALESKI on the TARGET DEVICE in October 2017 and advised him the FBI wanted to interview him regarding military explosives recovered from his brother's storage unit, along with unassembled STEN machine-guns in a box addressed to "Al Zaleski." The FBI advised ZALESKI unknown DNA had been obtained from the military explosives and the FBI suspected ZALESKI's DNA may be a potential match to it. The FBI further advised ZALESKI the FBI believed the statute of limitations had run its course and the government would not be able to charge ZALESKI if these items were in-fact his, so the FBI's sole interest in interviewing him was to ensure that all other military explosives left over from years ago could be recovered safely and destroyed so no one could get hurt. ZALESKI responded, "I guess you got them. You got it all then." ZALESKI advised he would contact his attorney and consider meeting with the FBI at a later date.

## ZALESKI's CONTINUED ATTEMPT TO ACQUIRE IEDs AND AMMUNITION

14.     In February 2018, the FBI was advised by U.S. Probation, who is currently supervising ZALESKI, an identified individual expressed concern ZALESKI had current access to grenades, wicks, gun parts and ammunition. The FBI subsequently contacted this individual and recruited the individual as a Confidential Human Source (CHS).

15.     According to the CHS, ZALESKI is the user of cellular telephone number (860) 797-4848, the "TARGET DEVICE", and has used this cellular telephone to coordinate the storage and subsequent return of "his stuff", specifically being ammunition and grenades. According to the CHS, ZALESKI has used the TARGET DEVICE to speak with the CHS to request the CHS drop off "his stuff" at an identified location of ZALESKI's choosing so ZALESKI could pick the items up without the CHS being present during a phone conversation.  The CHS, who provided information to your affiant in February 2018, had communicated with ZALESKI on the TARGET DEVICE multiple times within the last 8 months, approximately.

16.     ZALESKI had provided the CHS with "his stuff" approximately eighteen months ago after returning home from imprisonment and had asked the CHS to hold onto the items for him. The CHS was aware of ZALESKI's status as a convicted felon and understood ZALESKI was prohibited from possessing ammunition, firearms and other dangerous items, such as grenades.  Despite this understanding, the CHS agreed to store ZALESKI's "stuff" anyway.

17.     The CHS agreed to provide ZALESKI's "stuff" to the FBI so they could inspect the items for safety. On or about February 20, 2018, the FBI conducted a consensual search of the

items in possession of the CHS with assistance from the CSP Emergency Services Unit Bomb Squad. The FBI identified the following items of concern which were all stored together within a plastic cooler:

    a.   Six (6) round grenade bodies with intact fuzing systems

    b.   Fourteen (14) pineapple grenade bodies with intact fuzing systems

    c.   Four (4) boxes of 12-guage buckshot ammunition

    d.   Two (2) packages of "Bolo" Ammunition

    e.   One (1) package of Cannon Fuse

    f.   Twenty-Three (23) Grenade striker parts

18.     Visual inspection of the grenades by Bomb Technicians determined a hole had been drilled into the bottom of each grenade body. The grenade bodies did not contain any low explosive powder, high explosives or blasting caps. The fuzing systems were determined to be operational and capable of functioning subsequent to the installation of the grenade striker parts found co-located with the grenade bodies. Bomb technicians conducted a flame test on a sample piece of the cannon fuse and determined the fuse functioned as designed.

19.     As a SABT, your affiant has had training and experience in the identification, manufacturing and functioning of IEDs, or Destructive Devices, and has conducted an assessment of the materials obtained by the CHS from ZALESKI. Your affiant has determined these materials could be utilized to construct IEDs, or Destructive Devices, specifically being improvised

grenades. Although the materials at present state would not be considered an IED or Destructive Device, your affiant has determined the materials could be readily assembled to construct an IED.

20.     In March, 2018, the FBI attempted to utilize the CHS for a controlled delivery of the above items, but ZALESKI indicated "not mine not interested" in reply to an SMS photograph of the grenades and ammunition.   The CHS suspected that ZALESKI believed that law enforcement was monitoring these communications and was attempting to distance himself from his earlier attempts to acquire these items.

21.     Although the CHS[1] was newly developed in February 2018, several pieces of information provided by the CHS have been corroborated.  For example, the telephone number the CHS provided for ZALESKI was also corroborated through another witness and the FBI's telephonic contact with ZALESKI discussed above.  The fact of telephonic contact between the phones used by the CHS and ZALESKI was confirmed via physical visual inspection of the CHS's telephone.  According to the CHS, ZALESKI was renting a cabin in the woods located on Shuttle Meadow Ave in Berlin, CT; that was corroborated when the FBI interviewed the landlord of 863 Shuttle Meadow Avenue, Berlin, CT and confirmed ZALESKI is the current renter. In addition to these examples, your affiant is aware of additional corroborated information provided by the CHS.

---

[1]     Your affiant understands that the CHS does not have any criminal convictions or pending charges.  The CHS has a familial relationship with ZALESKI.

22.     On 04/04/2018, the FBI received records from Sprint identifying the subscriber of telephone number (860) 797-4848 as ZALESKI of 70 Brookside Road, New Britain, CT 06052. According to Sprint, the phone was activated on 12/31/2015 and remains active through this date; is affiliated with Electronic Serial Number (ESN) 089568154302726224; and able to receive data services in addition to traditional calling and SMS text messaging service.

## ZALESKI's FALSE STATEMENTS TO PROBATION AND THE COURT

23.     As part of ZALESKI's supervised release, there are special, mandatory and standard conditions of release. One of the mandatory conditions of his release is that he not commit any federal, state or local offense. In addition, ZALESKI has several standard conditions of release including that he "report to the probation officer as directed by the court or probation officer" and that he "shall submit a truthful and complete written report to the probation officer within the first five days of each month." ZALESKI must also "notify the probation officer at least ten days prior to any change in residence" as a standard condition of release.

24.     As part of his reporting requirement, ZALESKI submits online monthly reports that are transmitted to the United States Probation Office and ultimately to the District Judge responsible for his criminal case. ZALESKI must log on to the computer program using an online ID and password. The online reporting form plainly states that ZALESKI must answer the questions completely and correctly, and further warned ZALESKI that a false statement may result in prosecution under 18 U.S.C. Section 1001.

25.    The FBI has learned from U.S. Probation officials that ZALESKI reported 70 Brookside Road, New Britain, CT as his place of residence up to March 5, 2018 when he reported 65 Acorn Street, New Britain, CT as his residence.   As part of his monthly reports to U.S. Probation, ZALESKI has not reported any storage space or rental property, or association to any property located at 863 Shuttle Meadow Avenue, Berlin, CT, the (TARGET PREMISES) to Probation or the Court at any time.

26.    On March 23, 2018, the FBI interviewed the owner of the TARGET PREMISES, and learned ZALESKI has rented this property for years and remains as the current renter. The property is secluded and heavily wooded and contains a small cabin.  The owner advised ZALESKI is currently behind one month in rental payments, which are $300 per month. The owner further advised ZALESKI has missed payments in the past, and when this occurs, the owner contacts ZALESKI's father's business and a payment is made on ZALESKI's behalf. The owner advised he had visited this property approximately one month ago after a winter storm to assess any potential damage to the property or cabin caused by the storm. The owner observed a Buick station wagon parked on the property near the cabin and observed a motion light come on. The owner believed ZALESKI was inside the cabin and had no interaction with him, as he prefers to be left alone.  ZALESKI failed to disclose on his monthly reports in the section concerning his current monthly statements, that he pays $300 per month to rent the TARGET PREMISES.

27.    The FBI has confirmed the TARGET PREMISES is the same location the FBI searched in 2006 over a period of three days in which dozens of automatic machine guns and semi-

11

automatic firearms, multiple rifles and handguns, as well as silencers, fragmentation grenades, chemical grenades, smoke grenades and various homemade pipe bombs and IEDs were located and seized. The property was protected by booby-traps, including tripwires connected to percussion explosives and camouflaged plywood boards on the ground with nails protruding through them. The search resulted in the acquisition of over 600 separate items of evidence, one of the largest seizures of illegal weapons and dangerous items in Connecticut state history.

28.     On April 6, 2018, law enforcement conducted surveillance on the TARGET PREMISES and observed three cars: one black van, a white station wagon with wood trim and a Green Ford F-150 with a commercial plate of C078363.  The Green Ford F-150 is the same vehicle that ZALESKI identifies as his personal vehicle on his monthly reports to U.S. Probation and the Court.  Furthermore, the FBI has confirmed ZALESKI is the registered owner of this vehicle with Connecticut Department of Motor Vehicles.

29.     In addition, on his past three monthly reports to U.S. Probation and the Court, ZALESKI reported he had no access to firearms.  As indicated throughout this affidavit, ZALESKI had the CHS store IEDs, or Destructive Device components, considered to be firearms as defined within 26 U.S.C. § 5861(f), as well as firearm ammunition, until a time that he believed he could recover them and thus, he falsely stated that he had no access to firearms on all of these monthly reports.

30.     The false statements in the monthly reports submitted by ZALESKI to U.S. Probation and the Court were material to the ability of U.S. Probation to supervise ZALESKI and ensure that he was in compliance with all of the conditions of his release.   That is, the false statements made by ZALESKI were capable of influencing the assigned probation officer in deciding what steps, if any, should be taken to help the offender appropriately assimilate in society consistent with the sentence imposed by the Court   This is especially true here since he is concealing his connection to the TARGET PREMISES, which is the location of his previous offense conduct and he is further attempting to possess items in violation of federal and state laws.

### *Electronic Evidence*

### *Technical Terms*

31.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a.     Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities

include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.    Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

c.    GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each

14

satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

d.      PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs, often referred to as "smartphones," also function as wireless communication devices and are used for wireless phone calls and to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

e.      IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four

numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

      f.    Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

      g.    Storage media: this includes both compact disks that may be read by an optical drive on a computer, as well as various types of flash memory cards or miniature hard drive. These media are capable, in most cases, of storing any piece of electronic data described herein, and a user may use such media to backup, transfer, or otherwise store data from another device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

    32.    Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

16

33.     There is probable cause to believe that things that were once stored on the TARGET DEVICE may still be stored there, for at least the following reasons:

a.     Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.     Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.     Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special

17

software is typically required for that task.  However, it is technically possible to delete this information.

    d.    Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

    34.    *Forensic evidence.*  As further described in Attachment A, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the TARGET DEVICE was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Device because:

    a.    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b.      Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.      A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

35.      *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant.  The examination may require authorities to employ techniques, including but

not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

36.     With regard to the TARGET DEVICE, I request permission to enter and search such phone which may also be considered a PDA or "smart phone," for evidence relating to 18 U.S.C. §922(g)(1) (felon in possession of ammunition), 18 U.S.C. §842(i)(1) (felon in possession of explosives), 18 U.S.C. §842(h) (receipt, possession and transportation of a stolen explosive material knowing or having reasonable cause to believe the explosive materials were stolen), and 26 U.S.C. §5861(f) (make a firearm, specifically a "destructive device") (collectively, the "TARGET OFFENSES"). Your affiant also seeks evidence of the identity of the user and/or owner of the TARGET DEVICE.

37.     It is also requested that this Court grant permission to retrieve the above-described stored electronic information by printing said stored electronic information or otherwise reproducing said stored electronic information, by converting said stored electronic information, or by copying said stored electronic information into storage in another device.  It is also requested that the warrant be deemed executed once a TARGET DEVICE has been seized in the manner described above, and that further analysis of the images be permitted at any time thereafter.

### INFORMATION REGARDING CELLULAR TELEPHONES
### AND THE REQUESTED SEARCH WARRANT FOR THE DEVICE

38.     Based on my training, experience, I know that the aforementioned TARGET DEVICE may have different capabilities that allow some of it to serve as a wireless telephone,

digital camera, video recorder, portable media player, global positioning system (GPS)

navigation device, or a hand-held radio.  In my training and experience, examining data stored on

devices of this type can uncover, among other things, evidence that reveals or suggests who

possessed or used the particular device, as well as evidence relating to co-conspirators with

whom the device was in contact.

39.     With regards to the TARGET DEVICE, I request permission to enter and search

the TARGET DEVICE for evidence relating to the unlawful distribution and possession with

intent to distribute narcotics, including evidence of communications between ZALESKI and

others involved in unlawful narcotics trafficking.  Furthermore, based on my training and

experience, I know that wireless phones can contain evidence of message communications

between co-conspirators who distribute narcotics, or conspire to do so.  Also based on my

training and experience, I know that internet browsing history in wireless phones can contain

evidence of internet searches for locations and addresses of businesses associated with the

unlawful distribution of narcotics such as the businesses and locations used for distributing

contraband, renting or leasing vehicles to transport narcotics, and storing illegal narcotics such as

commercial storage facilities or other stash locations.  Also based on my training and experience,

wireless phones may contain videos and images of coconspirators, possible locations to ship,

receive, or store narcotics, the quantity of narcotics and/or shipping packages within which the

narcotics are concealed, and firearms, as firearms are generally considered tools of the trade in

narcotics activity. Specifically, based on my training and experience, I know the following

information tends to exist on wireless telephones, including phones used by those involved in the

distribution of narcotics:

    a.   the telephone number, ESN number, serial number, and SIM card number or any other unique identifying numbers associated with the said device;

    b.   the numbers, digits, stored messages (voice and/or text), letters, symbols, data, information, and images stored in the memory of said device;

    c.   descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to, the above-described crimes;

    d.   any and all records, however created or stored, which tend to demonstrate ownership and use of the phone, and identification bearing the name or photograph of any person, telephone-books, address books, date books, calendars, personal files, and photographs of persons contained in the phone;

    e.   any and all evidence showing or tending to show the identity of the maker or user of the data and information contained in the phone, such as passwords, sign-on codes, and program design;

    f.   Locations, route history, searches saved, GPS coordinates, waypoints, destinations, addresses, and location search parameters associated with GPS navigation software in the memory of said device;

    g.   internet browsing history, to include, internet searches in the memory of said device; and

    h.   Images and videos in the memory of said device.

    40.    It is also requested that the Court authorize the retrieval of the above-described

stored electronic information by printing said stored electronic information or otherwise

reproducing said stored electronic information, by converting said stored electronic information,

or by copying said stored electronic information into storage in another device. I am aware that

in some cases the software or equipment necessary to analyze wireless telephones in this manner

is not readily available to law enforcement during the course of the execution of a search and/or arrest warrant. Further, turning on wireless phones in a non-laboratory setting, where there is no "jammer" active or radio shielding devices, permits additional signals to be received by the phone and thereby alters the data present in the phone at the time of seizure. Therefore, it is often necessary to remove a seized phone to a laboratory in order to preserve the data therein from being corrupted.

41.     Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the TARGET DEVICE consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the TARGET DEVICE to human inspection in order to determine whether it is evidence described by the warrant.

### WIRELESS TELEPHONES AND FORENSIC ANALYSIS

42.     The warrant applied for to search the TARGET DEVICE would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

43.     As described above and in Attachment A, this application seeks permission to search and seize things that the TARGET DEVICE might contain, in whatever form they are stored. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Even when a user deletes information from a device, it can

sometimes be recovered with forensics tools.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

44.     Searching for the evidence described in Attachment A may require a range of data analysis techniques.  In some cases, agents and computer analysts may be able to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence.  In other cases, however, such techniques may not yield the evidence described in the warrant.  Criminals can mislabel or hide information, encode communications to avoid using key words, attempt to delete information to evade detection, or take other steps designed to frustrate law enforcement searches for information.  These steps may require agents and law enforcement or other analysts with appropriate expertise to conduct more extensive searches, such as scanning storage areas unrelated to things described in Attachment A, or perusing all stored information briefly to determine whether it falls within the scope of the warrant.  In light of these difficulties, the FBI intends to use whatever data analysis techniques appear necessary to locate and retrieve the evidence described in Attachment A.

### REQUEST FOR SEALING

45.     It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the applications and search warrants.  I believe that sealing this document is necessary because the items and

information to be seized are relevant to an ongoing investigation into ZALESKI and others who are of this investigation at this time.  Based upon my training and experience, I have learned that online criminals actively search for criminal affidavits and search warrants via the Internet, and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online through the carding forums.  Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.  I also request delayed notice of 30 days under 18 U.S.C. section 3103.

## CONCLUSION

46.     I submit that this affidavit supports probable cause for a warrant to search the **TARGET DEVICE** to the proposed warrant and seize the items described in described in Attachment A, as well as the **TARGET PREMISES** to the proposed warrant and seize the items described in Attachment B and the physical location of the TARGET DEVICE as outlined in Attachment C.

Respectfully submitted,

Keith M. Hall
Special Agent
Federal Bureau of Investigation


Subscribed and sworn to before me on April 9, 2018:    12:57pm


/s/

JANET C. HALL
UNITED STATES DISTRICT JUDGE

26